# Exhibit A

| Approved, SCAO | | Original - Court<br>1st copy - Defendant | | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|---|---|
| **STATE OF MICHIGAN**<br>2nd JUDICIAL DISTRICT<br>JUDICIAL CIRCUIT<br>COUNTY PROBATE | | **SUMMONS AND COMPLAINT** | | **CASE NO.**<br>17- 0286  NH |

Court address: 811 Port Street, St. Joseph, MI 49085

Court telephone no.: (269) 983-7111

**Plaintiff's name(s), address(es), and telephone no(s).**
PRESTON LEE CLAY WOLFORD, a minor, by and through his next friend and Mother, DEBORAH F. WOLFORD

v

**Defendant's name(s), address(es), and telephone no(s).**
South Shore Women's Health Care, P.C., Lakeland Hospitals at Niles and St. Joseph, Inc., Lakeland Medical Center, St. Joseph, Lakeland Regional Health System, Lakeland Healthcare, John Bard, M.D., and Mary Roe, M.D., and John Doe, R.N., jointly and severally,

**Plaintiff's attorney, bar no., address, and telephone no.**
William L. Benefiel (P24614)
710 Howard Street
Kalamazoo, MI 49008
(269) 388-4353

TO: Lakeland Hospitals at Niles and St. Joseph
c/o Lakeland Regional Medical Center, Inc.
Lakeland Medical Center, St. Joseph, Lakeland Health System, and Lakeland Healthcare
c/o Mary Ann Prater, Resident Agent
1234 Napier Avenue
St. Joseph, MI 49085

**SUMMONS**   NOTICE TO THE DEFENDANT: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or take other lawful action with the court (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued | This summons expires | Court clerk |
|---|---|---|
| DEC 12 2017 | MAR 13 2018 | SHARON J. TYLER |

Family Division Cases (The following is information required in the caption of every complaint and is to be completed by the plaintiff.)
☐ This case involves a minor who is under the continuing jurisdiction of another Michigan court. The name of the court, file number, and details are on page _____ of the attached complaint.
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The action  ☐ remains  ☐ is no longer  pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
|  |  |  |

Civil Cases (The following is information required in the caption of every complaint and is to be completed by the plaintiff.)
☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.
☒ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.

The action  ☐ remains  ☐ is no longer  pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
|  |  |  |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
|---|---|
| Buchanan | St. Joseph, Niles |
| Place where action arose or business conducted | |
| Berrien County | |

December 8, 2017
Date

Signature of attorney/plaintiff  William L. Benefiel

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you to fully participate in court proceedings, please contact the court immediately to make arrangements.

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF BERRIEN
811 Port Street, St. Joseph, MI 49085 – (269) 983-7111

PRESTON LEE CLAY WOLFORD,
a minor, by and through his Next
Friend and Mother, DEBORAH F.
WOLFORD,

        Plaintiff,

v

SOUTH SHORE WOMEN'S HEALTH
CARE, P.C., LAKELAND HOSPITALS
AT NILES AND ST. JOSEPH, INC.,
LAKELAND MEDICAL CENTER, ST.
JOSEPH, LAKELAND REGIONAL HEALTH
SYSTEM, LAKELAND HEALTHCARE,
JOHN BARD, M.D., and MARY ROE, M.D.,
and JOHN DOE, R.N., jointly and severally,

        Defendants.
_____/

Hon.

Case No. 17-        NH

William L. Benefiel (P24614)
Attorney for Plaintiff
710 Howard Street
Kalamazoo, MI 49008-1806
(269) 388-4353

## COMPLAINT

Plaintiff, by her attorneys, Benefiel & Farrer, pleads as follows:

1. This cause of action arises out of transactions or occurrences transpiring within the County of Berrien, State of Michigan.

2. The individual parties are residents of the County of Berrien, State of Michigan.

3. The remaining Defendants are corporate entities or businesses established and operating their activities within the County of Berrien, State of Michigan.

1

4. During all times relevant herein, the individual Defendants held themselves out to the public as having that level of skill and judgment that would conform to that level ordinarily exercised by other practitioners nationally in the respective fields; that unknown Mary Roe, M.D., and Defendant John Bard's level of skill and judgment would conform to that level ordinarily exercised by board certified practitioners in the field of obstetrics and gynecology; as well as unknown John Doe, R.N., and that all nurses and midwives would conform to that level ordinarily exercised by nurses and nurse-midwives in West Michigan, Michigan, and the United States.

5. That at all times relevant herein, the individual Defendants were employees or agents, actual or ostensible, of the remaining corporate Defendants or any of them, and that such others, such practitioners, including one Georgia Begnaud, CNM, who was also an actual or ostensible agent, or otherwise borrowed servant, of the Defendant's South Shore Women's Health Care, P.C., Lakeland Hospitals at Niles and St. Joseph, Inc., Lakeland Hospitals at Niles and St. Joseph, Inc., Lakeland Medical Center, St. Joseph, Lakeland Regional Health System and Lakeland Healthcares, or all of them.

6. During all times relevant herein, Defendants Lakeland Medical Center, St. Joseph and/or Lakeland Hospital at Niles and St. Joseph, Inc., Lakeland Regional Health System and Lakeland Healthcare (all hereinafter referred to as Defendant Lakeland Hospital) held itself out to the public as a provider of emergency medical services, including obstetric services and handling obstetric complications to members of the public.

7. During all times relevant herein, Defendant South Shore Women's Health Care, P.C., held itself out to the public as the provider of obstetric services, and that

2

its employees and agents, ostensible or otherwise, would conform to that level of care ordinarily exercised by such specialists in this Country.

8. On or about June 20, 2013, Preston Lee Clay Wolford's natural mother, Heather Ward, pregnant with Plaintiff's minor, came to the Defendant Lakeland Hospital emergency facility for apparent difficulties and possible complications from pregnancy; that Plaintiff looked to said hospital as open to the public for such services, and that Plaintiff came to such hospital with the belief that such facility would be suitable and competent for such services.

9. Prior to that time, said pregnancy and prenatal care had been provided by another clinician in South Haven, Michigan and the pregnancy had not been attended by any of the nurses, nurse-midwives, or physicians, anytime during her pregnancy and had no existing patient-physician, patient-nurse/midwife, or patient-clinician, in either Lakeland Hospital or any other facility, including one Georgia Begnaud, CNM, Rachael Proctor, M.D., John L. Bard, M.D., or any other clinician attending the mother of Plaintiff's minor.

10. At all times, the mother of Plaintiff's minor looked to Defendant Lakeland for professional obstetric services and agents and employees of Defendant Lakeland selected the clinicians that would attend to Plaintiff's case.

11. By its records and representations, Defendant Lakeland suggested that the subject Plaintiff's obstetric case was being handled by Dr. Rachael Proctor, Defendant, and Dr. Bard and Begnaud, or supervising such care, and that one or all of their such involvement was attributable to decisions by agents or employees of the Defendants, and not the mother of Plaintiff's minor.

3

12. That the medical chart for the in-hospital attendance for the subject obstetric case repeatedly designated Rachael Proctor, M.D., as the attending physician.

13. Following admission to Defendant Lakeland Hospital's facility, Pitocin administration commenced at approximately 4:03 a.m. on June 21, 2011, and a SVE of the patient by Georgia Begnaud, CNM, at 7:43 a.m., on June 21, 2011, wherein the patient was still at 5 cm, and the Pitocin was increased with an increasing rate as noted in the intravenous record at 7:33 a.m. At 12:30 p.m., a SVE determined that there was not a change in the progress of purported labor, and another SVE at 3:52 p.m., again showed 5 cm dilation with a rupture of membranes occurring.

14. The standard of care for a certified nurse midwife and a board certified obstetrician at that time and prior would require an assessment needed to be made about intrauterine pressures, the effects of the Pitocin administration, as well as gauging fetal heart rates to uterine activity, and that the installation of a IUPC to determine the uterine pressures was necessary to assess the continuation of Pitocin and interpretation of fetal heart rates, and the installation of a fetal scalp electrode; the standard of care would also call for a discontinuation and/or reduction of Pitocin, and no increases as occurred. A consultation with an obstetrician by the certified nurse midwife would also be indicated.

15. That at such times, the standards of care for obstetric nurses serving in the labor and delivery hospital department would be to report to the supervisors these instances that the nurse midwife; providing such increasing Pitocin at an increasing rate without instituting the additional monitoring noted above, including IUPC and fetal scalp electrode, was not exercising proper care and judgment and to request

4

clinical review by a qualified obstetrician and to intervene in the care of the patient during labor.

16. At said time and place, the Defendant Bard, unknown obstetricians, or known but not named as Defendant physician and midwife breached their respective standards of care in one or more of the following respects:

    (a)    Failing to insert an IUPC on a timely basis as noted;

    (b)    Failing to insert a fetal scalp electrode on a timely basis as noted;

    (c)    Continued use of Pitocin without the IUPC and FSE placement;

    (d)    Failing to timely consult an obstetrician and/or failing to timely supervise the activities of the CNM; and

    (e)    Failing to institute such measures again (a), (b), (c), and (d) for similar reasons between 4:30 to 4:40 p.m., and after 5:00 p.m., in light of the fetal heart rates at those times, again the standards of care were again breached by the involved clinicians.

17. That at such times, the standards of care for obstetric nurses serving in the labor and delivery hospital department assigned, involved, attending or supervising the subjects obstetric case during the relevant noted times, breached their respective standards of care in failing to so notify and report, as claimed in paragraph 15.

18. As a proximate cause of the breaches in the standards of care, the mother's intrauterine pressures increased ultimately causing the uterine rupture, which would have been prevented by the above measures which would have informed the clinicians of the increasing pressures caused by the Pitocin and that such stimulation would have been reduced or stopped in the exercise of proper judgment in accordance with the respective standards of care.

BENEFIEL & FARRER

5

19. As a result of the above breaches in the standards of care by all named an unnamed parties, known and unknown, in their respective fields, Plaintiff's minor sustained anoxic brain damage with loss in the abilities of speech, mobility, eating, thinking, and neurological disability with extensive medical, nursing care, and rehabilitation expenses; loss of earning capacity; pain and suffering; sensory deficits, and impairment including visual and hearing, to the extent determinable; and loss of the enjoyment of life. That such excessive pressures, contractions, and rupture would have impaired the proper vascular and oxygen supply to the fetus with fetal distress, fetal hypoxemia with eventual brain damage, and as further claimed in the Notice of Intent.

20. That the amount in controversy is in excess of $25,000.00.

21. Prior to suit, the Defendants were mailed and received a Notice of Intent pursuant to statute, viz., MCL 600.2912(B) and the Defendants have affirmatively denied the claim.

22. Attached hereto are the affidavits of merit, which the undersigned reasonably believes meets the requirements of statute and the affidavits qualifications.

WHEREFORE, Plaintiff prays for judgment in a sum to be set by the trier of facts, together with costs of this court, interest to date and reasonable attorney fees.

Dated: December 8, 2017

BENEFIEL & FARRER
Attorney for Plaintiff

By: _____
William L. Benefiel (P24614)

6

## AFFIDAVIT OF MERIT OF DONNA ROOSA, CNM, MS, RN, BSN

Donna Roosa, CNM, MS, RN, BSN, being first duly sworn, deposes and says as follows:

1. That I have read the relevant records pertaining to the labor and delivery records concerning the mother, Heather Ward and child, Preston Collins, during June 21, 2011, as well as subsequent records and the Notice of Intent.

2. According to the records, Pitocin administration commenced at approximately 4:03 a.m., on June 21, 2011, and the patient was examined by Georgia Begnaud, CNM, at 7:43 a.m., on June 21, 2011, wherein the patient was still at 5cm. and the Pitocin was increased with an increasing rate as noted in the "intravenous administration record," in the record at 7:33 a.m. Said Begnaud repeated a SVE at 12:30 p.m., again determining that there was not a change in the progress of purported labor, and another SVE by same at 3:52 p.m., again showing 5cm dilation, with a rupture of membranes occurring.

3. The standard of care for a certified nurse midwife at that time and prior, that an assessment needed to be made about intrauterine pressures, the effects of the Pitocin administration as well as gauging fetal heart rates to uterine activity, and that the installation of a IUPC to determine the uterine pressures, was necessary to assess the continuation of Pitocin and interpretation of the fetal heart rates. That at such times, and prior thereto, a fetal scalp electrode would also be indicated. The standard of care would also call for a discontinuation and/or reduction of Pitocin, and no increases as occurred. A consultation with an obstetrician by the certified nurse midwife would also be indicated.

4. The standard of care was breached by the certified nurse midwife the management of the patient up to this time at Lakeland Medical Center in that an IUPC was not inserted. The standard of care was breached by failing to place a fetal scalp electrode (as was eventually done at 6:22 p.m.). The standard of care was breached by such continued Pitocin administration without the IUPC and said FSE placement, and failing to consult with an obstetrician if the assessment was by a certified nurse midwife.

5. The standards of care would continue to call for these measures, again for similar reasons and particularly between approximately 4:30 to 4:40 p.m., and after 5:00 p.m., in guidance of interpretation of FHR's, in light of the entries regarding the FHR's at those times. Such standards of care were again breached by the certified nurse midwife and any obstetrician involved at those times.

6. Also, that such times with the labor and delivery, the standards of care for obstetric nurses serving in a labor and delivery hospital department would notify and report to the supervisors those instances that the nurse midwife, providing such increasing Pitocin at an increasing rate without instituting the additional monitoring noted above, including IUPC and fetal scalp electrode, was not exercising proper care

Page 1 of 2

and judgment, and to request clinical review by a qualified obstetrician and to intervene in the care of the patient during labor. That such standards of care were breached in their failure to so notify and report. (As a result of the above breaches, the consequences noted above, i.e., uterine rupture, fetal distress, and fetal hypoxemia with eventual brain damage occurred to the child).

7.   As a result of the breaches in the standards of care by all parties, Preston sustained anoxic brain damage, with loss in the abilities of speech, mobility, eating, thinking, and neurological disability with extensive medical, nursing care, and rehabilitation expenses; loss of earning capacity; pain and suffering; sensory deficits and impairments including visual and hearing, to the extent determinable, and loss in the enjoyment of life. That such excessive pressures, contractions, and rupture would have impaired the proper vascular and oxygen supply to the fetus with fetal distress, fetal hypoxemia with eventual brain damage, which according to the medical records occurred with Preston.

Dated: 2/22/17

_Donna Roosa, CNM, MS, RN, BSN_

Subscribed and sworn to before
me this 22nd Day of Feb, 2017.

_Notary Public_

SAMIR HELMY
NOTARY PUBLIC
State of New Jersey
My Commission Expires
November 29, 2021

Page 2 of 2

## AFFIDAVIT OF MERIT OF FREDERICKA S.M. HELLER, M.D.

Fredericka S.M. Heller, M.D., being first duly sworn, deposes and says as follows:

1. That I have read the relevant record pertaining to the labor and delivery records concerning the mother, Heather Ward and child, Preston Collins during June 21, 2011, as well as subsequent records and the Notice of Intent.

2. According to the records, Pitocin administration commenced at approximately 4:03 a.m., on June 21, 2011, and the patient was examined by Georgia Begnaud, CNM, at 7:43 a.m., on June 21, 2011, wherein the patient was still at 5cm and the Pitocin was increased with an increasing rate as noted in the "intravenous administration record," in the record at 7:33 a.m. Said Begnaud repeated a SVE at 12:30 p.m., again determining that there was not a change in the progress of purported labor, and another SVE by same at 3:52 p.m., again showing 5cm dilation, with a rupture of membranes occurring.

3. The standard of care for an obstetrician at that time and prior, that an assessment needed to be made about intrauterine pressures, the effects of the Pitocin administration as well as gauging fetal heart rates to uterine activity, and that the installation of a IUPC to determine the uterine pressures, was necessary to assess the continuation of Pitocin and interpretation of the fetal heart rates. That at such times, and prior thereto, a fetal scalp electrode would also be indicated. The standard of care would also call for a discontinuation and/or reduction of Pitocin, and no increases as occurred. A consultation with an obstetrician by the certified nurse midwife would also be indicated.

4. The standard of care was breached by the certified midwife and obstetrician involved in the management of the patient up to this time at Lakeland Medical Center in that an IUPC was not inserted. The standard of care was breached by failing to place a fetal scalp electrode (as was eventually done at 6:22 p.m.). The standard of care was breached by such continued Pitocin administration without the IUPC and said FSE placement, and by failing to consult with an obstetrician if the assessment was by a certified nurse midwife.

5. The standards of care would continue to call for these measures, again for similar reasons and particularly between approximately 4:30 to 4:40 p.m., and after 5:00 p.m., in guidance of interpretation of FHR's, in light of the entries regarding the FHR's at those times. Such standards of care were again breached by the clinicians involved at that time, certified nurse midwife and/or obstetrician supervising or participating in management.

Header:
Case 1:18-cv-00975-PLM-RSK  ECF No. 1-1, PageID.15  Filed 08/29/18  Page 12 of 12

6. As a proximate result of the breaches in the standards of care, intrauterine pressures increased ultimately causing the uterine rupture, that in all probability would have been prevented by such measures and would have informed the clinicians of developing increase in pressures, in whole or in part, caused by the Pitocin, which such stimulation could have been reduced or eliminated by cessation and/or reduction of Pitocin. That as a proximate result of such breaches, excessive uterine pressures, contractions, and ruptures would have impaired the oxygen supply and exchange through the placenta to the infant resulting in fetal distress, fetal hypoxemia with eventual brain damage, which according to the medical records occurred in this case to Preston.

7. During the year preceding the above, I spent the majority of my professional time in clinical practice as a board certified obstetrician and gynecologist.

Dated: 7/31/2017

_Fredericka S.M. Heller, M.D_
Fredericka S.M. Heller, M.D.

Subscribed and sworn to before me this 31st Day of July, 2017.

_Joanne B Spanier_
Notary Public

Berks County, PA

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Joanne B Spanier, Notary Public
Wyomissing Boro, Berks County
My Commission Expires May 17, 2021

Page 2 of 2